IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD, COUNTY FLORIDA

| | |
|---|---|
| WOODROW W. POWER, individually on behalf of himself and on behalf of those others similarly situated, | CASE NO.: |
| | |
| Plaintiffs, | CLASS REPRESENTATION |
| | |
| v. | |
| | |
| INSURANCE OFFICE OF AMERICA, INC., a Florida Corporation, IOA GROUP, LLC, a Florida Limited Liability Company, NUVIEW IRA, INC., a Florida Corporation, GRACE CHURCH OF GREATER ORLANDO, INC., a Florida not-for-profit Corporation, SHELDRICK, MCGEHEE & KOHLER, LLC, a Florida Limited Liability Company, JOHN HARROLD, a Florida Resident, WANDA HARROLD, a Florida Resident, ANTHONY GRIECO, a New Jersey Resident, MARK MANFRE, a Florida Resident, HEATH RITENOUR, a Florida Resident, JOHN K. RITENOUR, a Florida Resident, VALLI S. RITENOUR, a Florida Resident, ROB MOTLEY, a South Carolina Resident, BRUCE EADES, a Georgia Resident, JOHN WICK, a Florida Resident, JEFF LAGOS, a Florida Resident, TINA CHOINIERE, a Florida Resident, BRIAN MORAN, a Florida Resident, LISA QUINTERO, a Florida Resident, BETH SCHICK, a Florida Resident, GREGORY MASTERS, a Florida Resident THOMAS MEYERS a/k/a CHIP MEYERS, a Florida Resident, DON CLARK WHITTEN, a Florida Resident, GEORGE ANTHONY TATUM, a Florida Resident, JESS WRIGHT, a Florida Resident, STEVEN ROSENBLOOM, a Florida Resident, STEVEN SMITH, a Florida Resident, and JOHN DOE(S) an unknown person(s), | |
| | |
| Defendants. | |

_____

1

## CLASS ACTION COMPLAINT

**COMES NOW** Plaintiff, WOODROW W. POWER, individually on behalf of himself and on behalf of those others similarly situated, (hereinafter "Power" or "Plaintiff"), by and through undersigned counsel, and sues Defendants INSURANCE OFFICE OF AMERICA, INC. ( "IOA"), IOA GROUP, LLC ("IOA Group"), NUVIEW IRA, INC., ("NuView"), GRACE CHURCH OF GREATER ORLANDO, INC., ("Grace Church"), SHELDRICK, MCGEHEE & KOHLER, LLC ("Sheldrick"), JOHN HARROLD ("Harrold"), WANDA HARROLD ("Wanda"), ANTHONY GRIECO ("Grieco"), MARK MANFRE ("Manfre"), HEATH RITENOUR ("Heath"), JOHN K. RITENOUR ("John"), VALLI S. RITENOUR ("Valli"), ROB MOTLEY ("Motley"), BRUCE EADES ("Eades"), JOHN WICK ("Wick"), JEFF LAGOS ("Lagos"), TINA CHOINIERE ("Choiniere"), BRIAN MORAN ("Brian Moran"), LISA QUINTERO ("Quintero"), BETH SCHICK ("Schick"), GREGORY MASTERS ("Masters"), THOMAS MEYERS a/k/a CHIP MEYERS ("Meyers"), DON CLARK WHITTEN ("Whitten"), GEORGE ANTHONY TATUM ("Tatum"), JESS WRIGHT ("Wright"), STEVEN ROSENBLOOM ("Rosenbloom"), STEVEN SMITH ("Smith"), and JOHN DOE(S) (hereinafter collectively "Defendants"), and alleges as follows:

## JURISDICTION, PARTIES AND VENUE

1.  This is an action seeking damages in excess of Fifteen Thousand Dollars and No/100 ($15,000.00).

2.  Venue is appropriate in this Court because at least one of the Defendants regularly conducts business in Broward County, Florida, and because a substantial part of the transactions and occurrences underlying Plaintiff's claims occurred in this jurisdiction. For example, *See* ¶¶ 37, 39, i.e., Defendant Harrold, a purported "Vice President" of IOA, who is one of the top 5 IOA

producers/insurance agents, whose activities at the Broward Office relate to the systemic overbilling and general customer fraud which included making repeated misrepresentations relative to insurance pricing. *See also* ¶ 41 related to **Defendant Harrold's pre-suit attempts to criminally extort and intimidate Plaintiff by threatening him over the telephone** after Demands for Preservation of Evidence were served on behalf of several of the Defendants.

3.   The activities of the Defendants and their co-conspirators as described herein have been within the flow of interstate commerce on a continuous and uninterrupted basis and have had a substantial effect on interstate commerce.

4.   Plaintiff Woodrow W. Power is a South Carolina resident and is otherwise *sui juris*. Plaintiff purchased shares of the IOA Group's common stock directly pursuant to the materially false and/or misleading representations and incurred damages as a result thereof.

5.   Defendant IOA is a Florida corporation and, which pursuant to Fla. Stat. § 47.051, venue is appropriate in Broward County, Florida as Defendant IOA has two offices in Broward County, Florida for the transaction of its customary business, where it regularly employs individuals and independent insurance agents, has customers and transacts insurance brokering.

6.   Defendant IOA Group is a Florida Limited Liability Company with its principal place of business in Seminole County, Florida.

7.   Defendant NuView is a Florida Corporation with its principal place of business in Seminole County, Florida.

8.   Defendant Grace Church is a Florida not-for-profit Corporation with its principal place of business in Seminole County, Florida.

9.   Defendant Sheldrick is a Florida Limited Liability Company with its principal place of business in Duval County, Florida.

10. Defendant Harrold is a Florida resident residing in Palm Beach County, Florida and is otherwise *sui juris*.

11. Defendant Wanda is a Florida resident residing in Palm Beach County, Florida and is otherwise *sui juris*.

12. Defendant Grieco is a Florida resident residing in Orange County, Florida and is otherwise *sui juris*.

13. Defendant Manfre is a Florida resident residing in Orange County, Florida and is otherwise *sui juris*.

14. Defendant Heath is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

15. Defendant John is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

16. Defendant Valli is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

17. Defendant Wick is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

18. Defendant Motley is a South Carolina resident and is otherwise *sui juris*.

19. Defendant Eades is a Georgia resident and is otherwise *sui juris*.

20. Defendant Lagos is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

21. Defendant Choiniere is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

22. Defendant Brian Moran is a Florida resident residing in Orange County, Florida and is otherwise *sui juris*.

23. Defendant Quintero is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

24. Defendant Schick is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

25. Defendant Masters is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

26. Defendant Meyers is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

27. Defendant Whitten is a Florida resident residing in Seminole County, Florida and is otherwise *sui juris*.

28. Defendant Tatum is a Florida resident residing in Duval County, Florida and is otherwise *sui juris*.

29. Defendant Wright is a Florida resident residing in Duval County, Florida and is otherwise *sui juris*.

30. Defendant Rosenbloom is a Florida resident residing in Duval County, Florida and is otherwise *sui juris*.

31. Defendant Smith is a Florida resident residing in Duval County, Florida and is otherwise *sui juris*.

32. Defendant(s) John Doe(s) is/are unknown persons or entities who are within the jurisdiction of this Court who is/are, upon information and belief, responsible/liable/culpable to Plaintiff for damages relative to its claims herein.

## RESERVATION TO NAME ADDITIONAL DEFENDANTS

33. In addition to the entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff but respecting whom Plaintiff currently lacks specific facts to permit Plaintiff to name such person or persons as a party-defendant(s). By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant adding such parties.

## PRELIMINARY STATEMENT AND ALLEGATIONS

34. This Complaint sets forth in detail a criminal and fraudulent enterprise and scheme to defraud shareholders of IOA through an illegal PONZI scheme which involves defrauding employees, independent sales agents and customers of Defendant IOA. This PONZI scheme works by enticing fresh victims to buy IOA's stock at hugely inflated prices to pay for individuals who IOA terminates or leave the company on other terms. This fraudulent enterprise involves, in part, the systemic wrongful "acquiring" of large accounts by Defendant IOA through "stealing" the same from IOA Agents. The "stolen" account is generally an account which generates large profits for IOA and provides IOA the opportunity to add it to its "Book of Business" for purposes of artificially inflating IOA Group's stock price and hide IOA's true business health.

35. This scheme also involves the systemic culture and practice of fraudulently overbilling and over charging IOA customers by cleverly charging "agency fees" and additional "marketing fees" over and above a clients' insurance premium to gain additional commissions and fraudulently double-bill.[1] This illegal charging of "agency fees" or "marketing fees" fraudulently involves

---

[1] *See* article wherein Insurance Office of America and one of its producers are alleged to have schemed three corporations out of millions of insurance premiums; https://legalnewsline.com/stories/511474383-florida-insurance-broker-firm-alleged-to-have-billed-double-commissions.

deceiving customers into believing they are receiving services for paying additional premiums, which are unnecessary, and, in fact, never provided.

36. The practice of stealing a large account and essentially double charging IOA customers allows Defendant IOA to manipulate the value of its non-publicly traded stock, which is offered and practically forced upon IOA independent sales agents and employees at annual shareholders meetings. The purpose behind this scheme is to line the pockets of Defendants Heath, John, as well as, certain IOA board members, their in-house legal counsel and other long-time Ritenour "Captains" – while coercing unsuspecting IOA employees and independent insurance agents to continue to buy stock, which has no immediate redeemable value.

37. One of IOA's Broward County, Florida offices, which is managed by Defendant John Harrold, a purported "Vice President" of IOA, is the South Florida hub of IOA's criminal scheme to fraudulently inflate IOA's stock price. Defendant Harrold is one of the top 5 IOA producers/insurance agents, and whom with his daughter, where instrumental in opening IOA's international office located in London, England. Defendant Harrold's activities at the Broward Office relate to the systemic overbilling and general customer fraud which included making repeated misrepresentations relative to insurance pricing.

38. These activities are a substantial and intricate part of a larger criminal enterprise and culture which spans the United States by IOA and IOA-related individuals whose primary aim is to illegally pump up Defendant IOA's stock to enrich a handful of IOA Board Member's pockets and to make millions of dollars for Defendants John, Heath and Valli.

39. While Defendants John, Heath and Valli do indeed "run the show", their wrongdoings are not severable from individuals, like Defendant Harrold, who operate their own "region" like the one here in Broward County, Florida operated by Defendant Harrold.

40.The PONZI scheme is multifaceted and at every turn, Defendants John and Heath make a dirty dollar on a dirty dollar – and like other criminal organizations, Defendant IOA has its means to keep its people in line and hide their tracks by destroying evidence.   In this racket, loyalty is all but pledged to the Ritenour family. Crossing the Ritenours or IOA has severe, quick and certain consequences as the IOA crime syndicate has many enforcers who intimidate and threaten anyone who calls out wrongdoings, steps out of line or attempts to seek judicial relief after being defrauded in one way or another by IOA. In some cases, this means immediate termination no matter how long and loyal the employee or agent had been; in others, it means using IOA lawyers to threaten and intimidate individuals relative executing bogus agreements which require their silence as to IOA's litany of fraudulent schemes; and in some this means Defendant John and Heath direct one of their lieutenants to send a message of fear and consequences.

41.  Most recently, one of Defendant John's cronies picked up the phone from IOA's Broward County office to "explain" things to victims who became courageous enough to stand up to IOA's bullies. For example, this case is related to several recently filed cases in Broward County. As these cases have been filed, several of the Plaintiffs or witnesses related thereto have been contacted directly by some of the Defendants in an attempt to criminally coerce them to stop the pursuit of justice in a court of law. Most recently, on Friday, February 21, 2020, just prior to this lawsuit being filed, Defendant Harrold called Plaintiff from IOA's Broward County Office where he serves as Vice President after he became aware that some of the Defendants had been served Demands to Preserve Evidence in this case.  In that call, Defendant Harrold directly demanded Plaintiff to remove him and others from this lawsuit by threatening Plaintiff with imminent consequences. On the same day, Defendant Harrold also contacted another Plaintiff from Broward County (in a matter which he is also a Defendant) for purposes of circumventing the consequences

of his and IOA's actions. On February 21, 2020, Defendant Harrold was sent a correspondence demanding he cease and desist contacting Plaintiff. Notwithstanding confirmed receipt of the letter, on February 24, 2020, Defendant Harrold, once again from Broward County, attempted to contact and coerce Plaintiff in furtherance of protecting IOA, Defendants John and Heath, himself and others from the prosecution of this lawsuit.

42. As set forth in detail hereinbelow, the breadth and scope of the RICO Defendants' Ponzi Scheme, which includes close to a million outstanding shares and over $10,000,000.00 of new IOA Group stock purchases by 109 members in 2019 alone, results in Class damages likely **exceeding ONE HUNDRED MILLION DOLLARS ($100,000,000.00).**

## CLASS REPRESENTATION ALLEGATIONS

43. Plaintiff and Class Members bring this class action against Defendants on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 1.220 of the Florida Rules of Civil Procedure. The proposed classes are defined as follows:

    a) All individuals whether in Florida or otherwise who were authorized to purchase and did purchase IOA Group LLC stock from 2008 to present; and

    b) All individuals whether in Florida or otherwise who purchased IOA Group LLC stock and received a promissory note for repayment of purchased stock instead of the actual redemption value.

44. Excluded from the Class are Defendants, any entity in which any defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a defendant and any of Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

45. Plaintiff and Class Members reserve the right to propose subclasses or modify the above class definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

46. This action has been brought and may properly be maintained as a class action against the Defendants pursuant to the provisions of Rule 1.220 of the Florida Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are ascertainable.

47. **Numerosity**: Plaintiff and Class Members do not know the exact size of the Classes but they are each composed of more than 500 persons and the precise number of class members can only be determined though appropriate discovery. The persons in the Classes are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

48. **Commonality**: Pursuant to Fla. R. Civ. P. 1.220(a)(2), there are questions of law or fact common to the Class or Classes that predominate over any questions affecting only individual members, including:

   a. Whether Defendants intentionally deceived individuals by artificially inflating IOA Group stock value by engaging in a pattern of Racketeering Activity as prohibited by Florida law;
   b. Whether Defendants violated Florida's Securities law by making false statements in connection with the sale of private stock;
   c. Whether Defendants have engaged in the schemes or artifices described herein to improperly and unlawfully sell privately held stock within at significantly inflated values;
   d. Whether Defendants have engaged in mail and wire fraud;
   e. Whether Defendants engaged in money laundering;
   f. Whether Defendant engaged in tax evasion;
   g. Whether Defendants engaged in splitting insurance commissions with unlicensed individuals and entities;
   h. Whether Defendants engaged in criminal theft;
   i. Whether Defendants have been unjustly enriched by their conduct;
   j. Whether Plaintiff and Class Members are entitled to equitable and injunctive relief;
   k. Whether punitive damages should be awarded;
   l. Whether Defendants fraudulently concealed their scheme; and

m. Whether, and to what extent, Defendants are liable for the conduct alleged herein.

49. **Typicality**: Pursuant to Fla. R. Civ. P. 1.220(a)(3), Plaintiff and Class Members' claims are typical of the claims of the class. Plaintiff and Class Members were injured through Defendants' uniform misconduct. Plaintiff and Class Members are advancing the same claims and legal theories on behalf of themselves and class members, and there are no defenses that are unique to Plaintiffs' claims. Plaintiffs' and class members' claims are from the same set of operative facts and are based on the same legal theories.

50. **Adequacy**: Plaintiff and Class Members will fairly and adequately protect the interests of the class. Plaintiff has retained competent and capable attorneys experienced in complex and class action litigation, including consumer class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so. Neither Plaintiff and Class Members nor their counsel have interests that are contrary to or that conflict with the class.

51. **Predominance**: The common issues that comprise the basis for this lawsuit predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

52. **Superiority**: Pursuant to Fla. R. Civ. P. 1.220(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of the controversy because, absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain ill-gotten gains; it would be a substantial hardship for most individual class members if they were forced to prosecute individual actions; once liability has been adjudicated, the Court will be able to determine the claims of all class members; a class action

will permit an orderly and expeditious administration of the claims, foster economies of time, effort and expense, and ensure uniformity of decisions; the lawsuit presents no difficulties that would impede its management by the Court as a class action; and Defendants acted on grounds generally applicable to class members, making class-wide relief appropriate.

## GENERAL ALLEGATIONS

53. In September 2005, Plaintiff, Woodrow Power joined Defendant IOA of the South Carolina office of Insurance Office of America, Inc. Shortly after his joining the IOA team, he was appointed Branch Manager. This title changed several years later to Managing Partner. Plaintiff's role and responsibilities included managing the office, overseeing the members of the sales force and working with office staff to support IOA's insurance producers.

54. In the beginning of Plaintiff's tenure, upper management, such as Defendant John, welcomed participation and sought input relative to what would make the company better and stronger. In fact, even ground level insurance producers were expected to participate by donating their time to running and maintaining operations. This donated participation was considered essential as it saved costs by not having to hire salaried individuals.

55. While producers filling the roles of salaried employees were not paid for their "donated time", those producers who ended up spending considerable time on this work did not see a three-point reduction in commissions when Defendant IOA changed the landscape of how they did business and how they compensated those producers.

56. All was seemingly well for Defendant IOA as it turned the age of 21, but Defendant John began to feel as though his concept of paying the highest commissions in the industry wasn't working out for him financially as well as he had hoped. It was around this time when Defendant John began to steer the ship for his and his families' personal financial windfall.

57. When Plaintiff joined Defendant IOA in 2005, all producers were paid 60% commissions on new and renewal business. Some years later, the commission model changed, based upon the producer's book size, the commissions dropped as low as 42%. While the thought was to give incentives to "work harder", Defendant IOA's policies had an inverse effect which has been described by many IOA personnel as ushering the age of mediocracy. In fact, while some believed producers would aspire to reclaim the 60% commission splits, most were content to receive the lower commissions. Additionally, it didn't take long for Defendant IOA to discover that they made more money with more agents with smaller books as they only had to pay them nearly half of what they paid producers with very large accounts and very large books.

58. This was the beginnings of putting profits before personnel and where Defendants John, Valli, Heath, Harrold and other long-time Ritenour cronies began to develop the mechanics of inflating IOA's value for purposes of stock manipulation.

**Putting Profits before Personnel – The beginning of the Stock Manipulation Scheme**

59. The producers whose commission rate were lowered to 42% and didn't leave, were an interesting breed as any agency would pay 40% commission and also pay for expenses plus benefits. This breed of individual cared less, produced less and in some cases, caused internal human resource problems for Defendant IOA. However, the most noticeable grass level effect of the lowering of commission rates to 42% was that lower level producers with smaller books began to learn their own commissions and books could be increased by adding fees sponsored by Defendant IOA. Moreover, in some cases, lower level and top producing insurance agents added their own fees to client bills and Defendant IOA turned a blind eye.

60. By 2010, it was clear that all Defendant John, Valli, Heath and their loyal lieutenants cared about was Defendant IOA's bottom line and the race to the bottom was on.

61. Adding fees to a customer made it easier for an IOA producer's book of business to grow as opposed to seeking new business. The level of apathy and culture of fraud began to spread from lower level support staff all the way up to top level board members who served as directors equally began sinking to the standards of corrupt producers.

62. As Defendant IOA continued to grow from 2009 through 2015 through several illegal schemes, the changes implemented by Defendant John and enforced in Broward County by Defendant Harrold became more and more evident.  It was no secret that Defendant John was contemplating retirement and, in the process, cementing his son, Defendant Heath, to become the new king and Chief Executive Officer.  In fact, Defendant John investigated to alternative to Defendant Heath, no interviews for CEO were entertained – which is highly unusual for a company claiming to be doing over Two Hundred Million Dollars per year.  There was also no secret that the individual members of Defendant IOA's board of directors had no confidence in Defendant Heath and privately talked about how to convince Defendant John to rethink placing his son at the head of such an empire without any experience whatsoever.

63. However, none of the board directly challenged Defendant John as many individuals who even dared question his other business decisions were "kissing on the stage one day and fired the next". Defendant John's private reputation was one of suspicion and paranoia and he never took chances, he just fired people to send messages than no one is above him or Defendant Heath.

64. As time progressed, Defendant John made Defendant IOA's Board of Directors permanent so as to protect Defendant Heath, and to insulate the scheme to inflate IOA's privately held stock on the back of stealing large accounts and overcharging customers with fees.

65. Defendant Heath has no intention of receiving any negative feedback, and when he is questioned, his "public" response has been "there is the door" to many long-time IOA agents and

employees – even ones that were once loyal to his father for many years.  In private, once an individual has been deemed disloyal or a threat, Heath ensures their days are numbered.  Since taking the helm, Defendant Heath has become experienced in ruling with an iron fist and wheedling his power to terminate and intimidate with Defendant John and Vali's full support.

66. Over the course of Defendant Heath's tenure, the permanent board issued policies that made Defendant IOA more of a corporate America company.  The permanent board members were promised large retirements from their ownership of IOA's exponentially increasing stock and there is no one to stop the criminal fraudulent scheme as anyone who ever had Defendant John or Heath's ear has been eliminated.

67. In or about 2003, Defendant Motley joined IOA and thereafter, in or about 2008 was appointed a board member. In or about 2013, Defendant Motley became the Regional President of IOA's South Carolina operations and, thus, Plaintiff's direct upline insurance agent. At the beginning, Defendant Motley was open to suggestions. During this honeymoon period, Plaintiff was instrumental in building IOA's South Carolina operations.

68. On numerous occasions, from 2010 through 2019, Defendant Lagos and others acknowledged Plaintiff for running the Columbia office as Defendant Motley was absent more than he was present. Plaintiff was invited to numerous sales meetings throughout the year to spend time with Defendants John and Heath because of his workmanship and dedication to the Columbia office's success.

69. After returning from each of these sales meetings, Defendant Motley began to make changes to the Columbia office in line with Defendant Heath's unethical and illegal directives. In most instances, Plaintiff would voice his concern to Defendant Motley who turned a blind eye.

Plaintiff particularly pointed out how the "rules" seemed to bend and break for the Regional Presidents and Permanent Board Members.

70. Ultimately, by 2017, after a thirteen-year career with Defendant IOA, it was becoming clear that Defendants Motley and Eades (Defendant IOA's Regional President located in Georgia) were looking for a way to push Plaintiff out the door as Plaintiff continued to call them out for greedy and unethical business practices.

71. In August 2018, Defendant Motley called Plaintiff into his office and mentioned it was time to part ways and Plaintiff agreed. On or about November 1, 2018, Plaintiff left Defendant IOA and thereafter Defendant IOA made very difficult for Plaintiff to move his book of business. Defendant IOA charged additional fees, withheld electronically stored information, and withheld a $5,000.00 fee for payment of alleged debts with absolutely no accounting for same.

**Plaintiff falls prey to IOA's stock scheme**

72. Since 2007, and over the course of next 11 years, Plaintiff was offered to purchase IOA stock. From 2007 through 2018, Plaintiff attended each yearly shareholders' meeting where he was told that Defendant IOA's stock is a once in a lifetime opportunity, that the value of the company had soared with larger profits, bigger investments and was all legitimized by a third-party evaluation company.

73. Plaintiff was shown the same power point presentation created by Defendants John, Heath, Masters and Meyers at the shareholders' meeting as every other shareholder from 2007 to 2018. This power point presentation, along with the representations made by Defendants John, Heath and Masters were the basis upon which Plaintiff purchase stock over the years.

74. In April 2018, Plaintiff was again offered to purchase stock and again agreed to buy shares based upon information presented at the yearly shareholder meeting.  Beginning in about March

2018, Defendant IOA began deducting $2,647.49 per month for four months from his commissions to pay for the stock, however, when Plaintiff left IOA in November 2018, he was told that he never purchased stock in 2018.

75. When Plaintiff left Defendant IOA, he owned approximately $500,000.00 in stock which was then allegedly commuted into an unsecured promissory note which precluded Plaintiff from cashing out his equity and essentially allowed Defendant IOA to pay him back over the course of five (5) years.

76. Neither Plaintiff, nor any other shareholders, knew or could have discovered the breadth and scope of the fraudulent criminal schemes conducted over the course of time which artificially inflated Defendant IOA's stock value.

## FACTUAL CLASS ACTION ALLEGATIONS

**The PONZI SCHEME to steal employees stock purchase monies and confiscate independent representative's insurance accounts in connection with offer, purchase, or sale of IOA Group member units.**

77. Defendant IOA is a full-service insurance agency and one of the largest independent companies in the United States. IOA was founded in 1988 by Defendant John and his wife Valli Ritenour, and, according to its website, IOA currently has over one thousand "team members" and boasts $198 Million Dollars in revenue.

78. IOA recruits independent insurance agents with the allure that they will be "partners" and part "owners" of the IOA Company. The top "selling point" of the IOA brand is that it offers the highest commissions in the industry – between 57% and 60% for new and residual business and all sales associates own their own book of business and are free to leave IOA at any time and retain ownership of all their insurance accounts. The promise of "high" commissions is the classic bait and switch as Defendant IOA's Independent Agent Agreements are wholly one sided and create intentional confusion as to the method of calculation of commissions – or ability to "leave" with

the agent's book of business. At the end of the day, an employee or agent of Defendant IOA will never see anything near the promised commissions after bogus fees, deductions, and double dipping.

79. However, John and IOA's secret is that they created a company culture permitted the double billing of IOA customers and which steals from IOA agents by claiming agents' accounts as their own and thereafter manipulating corporate financial records to artificially inflate IOA's private stock and overall financial health. Defendant John claims to have founded IOA because one of his former employers engaged in fraudulent business practices. Ironically, Defendant John's company has taken fraud to a completely new level where a "dirty dollar makes a dirty dollar which makes multiple dirty dollars".

80. Defendants John, Heath and their Board Member cronies know by stealing accounts, skimming off commissions, permitted the deception of IOA customers and shaking down IOA agents with no one to challenge them, Defendant IOA's stock price can be manipulated for an "Enron-like" financial windfall. Indeed, Defendants John and Heath's wealth, power and influence, and that of their corporate enablers, have made them "untouchable" in the eyes of the hard-working IOA independent sales agents and employees who dare not question their practices.

81. As a result of stealing large accounts and insurance commissions, overcharging IOA customers and many other unscrupulous efforts, IOA Group, LLC, a subsidiary of Defendant IOA, saw its member units explode in value from 2010 to 2018. During that period, IOA Group, LLC's member units increased three-fold over 320%, which is unheard of for a company within this sector.

**Sheldrick is the Catalyst for IOA Group's Stock Inflation**

82. IOA Group's stock inflation was procured through the help of Sheldrick, IOA's valuation company.

83. Since at least 2008, IOA and IOA Group contracted with Sheldrick to conduct a valuation of both companies.

84. As could not be more clearly stated by anyone better, IOA's annual 2009 annual meeting minutes, Sheldrick exalted "[i]n the face of difficult times in the public markets and macro economy," Sheldrick valued IOA Group's stock to have risen 7% in 2008 from 2007 and again another 7% from 2008. In 2010, still in the face of a national struggling economy, Sheldrick reported that IOA Group stock increased a whopping 16% increase:

> • The value of the stock for 12-31-2008 as reported by Jess Wright of the valuation firm Sheldrick, McGehee & Kohler is $224.85 per share for IOA Group, LLC, up over 7% from last years amount of $209.95 was announced. In the face of the difficult times in the public markets and macro economy this was viewed as a very positive accomplishment. Sheldrick, McGehee & Kohler is a 60 year old firm nationally recognized which performs the independent valuation of Insurance Office of America, Inc and it's affiliates and subsidiaries.

> • The value of the stock for 12-31-2010 as reported by Jess Wright of the valuation firm Sheldrick, McGehee & Kohler is $278.91 per share for IOA Group, LLC, up over 16% from last years amount of $240.36 was announced. Sheldrick, McGehee & Kohler is a 60 year old firm nationally recognized which performs the independent valuation of Insurance Office of America, Inc and its affiliates and subsidiaries. Insurance Office Of America's stock include the above # was separately valued at $179.22 vs $169. per share last year.

85. Peculiar enough, from 2007 to 2010, IOA's annual meeting minutes only show growth of the company's, together with its subsidiaries, profitability at a one percent (1%) increase:

- Insurance Office of America closed the year with $79 million in revenues in 2008 in insurance operations with $7million of that coming from the wholesale operations. We generated $1.4 million in operating profit, had a cash position of $17 million and over $9.7 million in net equity at year end. On a consolidated basis we totaled nearly $98 million in revenue including all the affiliates. The affiliates exclusive of Insurance Office...

- Insurance Office of America closed the year with $80.4 million in revenues in 2010 in insurance operations as compared to $79.8 million in 2009. $8.3 million of that came from the wholesale operations up from nearly $8 mm in 2009. We generated $2.2 million in operating profit both years, and had a cash position of $15 million and over $12 million in net equity at year end. On a consolidated basis we totaled nearly $99 million in revenues including all the affiliates, plus an additional $3mm in IOA NE. The affiliates, exclusive of Insurance Office of...

86. Somehow, however Sheldrick's valuations continued to prove erroneous and reached values far in excess of fair market value, despite the continuous decline of the United States economy.

87. With Sheldrick's acquiescence, or better still, aid, IOA reported on its financial statement, higher commission revenues and thereby increased the value of membership units of IOA Group, LLC. Employees relied on these financial statements and the statements made by Heath, John, IOA Board Members and other administrators and "branch" management to purchase member units, hoping in part to receive dividends and additional remunerations for their hard work and performance at IOA. After all, IOA touts "our producers and employees have a vested interest in the overall success of the company and not just their book of business or salary. "Owners/Entrepreneurs" go the extra mile to make sure the job gets done."

88. IOA, however, failed to disclose and concealed that IOA reaped commissions from stolen accounts from its independent representatives and overcharging IOA customers. Had IOA not stolen the accounts from its independent representatives, the independent representatives and **not** IOA, would have received the commissions.

89. Instead, IOA inflated its commissions and thereby inflated the value of membership units of IOA Group, LLC only to later sell the artificially inflated member units back to unsuspecting employees and independent sales agents, all the while Defendants Heath, John, IOA and IOA Group knew the member units to be essentially valueless and worthless upon the discovery of this Racketeering Scheme.

90. John and Heath aggressively promoted the illegally tainted shares. For example, at a recent annual sales meeting, Heath touted IOA's shares as a "unique investment opportunity". Specifically, Heath boasted that this is a "once in a lifetime opportunity"; "you will never get another chance like this."  In fact, John and Heath were soliciting employees and independent agents to buy John's IOA Group shares thereby liquidating John's interest in IOA Group to allow John to "cash out" and retire, all at a fraudulently inflated member unit price. In fact, in IOA's April 16, 2009 annual meeting, the concept to take on new "partners" for the purpose of "cashing out" retiring or department shareholders was first conceived:



91. Although such information clearly would have been material to Plaintiff and the Class Members, and although disclosure of such information was necessary given the misleading and false statements and representations convey by Defendants affirmative conduct and statements, Defendants omitted any disclosure of: the scheme; the factors distorting and rendering inaccurate stock calculations; the inappropriate nature of valuations used; the silent and secret relationships between the Defendants and their officers, agents, employees and associates; the true affiliations between the co-conspirator entities that were contrary to the appearance of independence they conveyed; and the kickbacks and private profits realized by Defendants, their officers, employees and agents.

92. IOA shares <u>cannot</u> be sold on the open market to the public. John was therefore unable to liquidate his shares and realize an immense profit. John and Heath created a scheme whereby they would be able to get IOA employees and independent representatives to fund the "cash-out" of John's IOA inflated shares. There would be little or no ability for the employees and independent representatives to scrutinize their investment or verify the validity of its true value. John was able

to sell his IOA Group shares without providing any financial disclosures, much less the extensive financial reporting that would have otherwise been required had the shares been sold to anyone else, thus taking advantage of naïve unsuspecting employees and independent sales agents who don't have the business acumen to understand such a scheme.

93. Shares of private companies are generally priced at a discount from shares of similar companies on the public market for numerous reasons.  For example, the lack of liquidity and the inability to resell the shares bears negatively on the shares' price. Additionally, a lack of regular annual dividends also bears negatively on the price.

94. In connection with the offer, sale, or purchase of any investment or security, IOA directly or indirectly employed a device, scheme, or artifice to defraud, obtain money or property by means of untrue statements of a material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or engaged in transactions, practices, or course of business which operates or would operate as a fraud or deceit upon a person.

95. Furthermore, IOA Group, by and through its general in-house counsel and private outside counsel, Defendants, Wick, Tatum, upon information and belief Brian Moran and John Doe(s), draft stock purchase agreements and promissory notes in connection with the purchase of the IOA Group stock with the underlying intent to defraud employees and independent sales agents. More specifically, these agreements tie the unsuspecting investors monies' up so that the "RICO" Defendants can use the new investment monies to repay other, different investors when their redemption period accrues. Defendants, Wick, Tatum, Brian Moran, and John Doe(s) draft these agreements and thereafter enforce these agreements by proverbially "holding hostage" the investors monies for a term of 3-6 years after the redemption period of an investor has accrued.

Essentially, on the face of these agreements, the investors appear to be gaining 270 to 320 percent returns on their investments, but the stock purchase agreement does not ever disclose to the investors where their monies are being held, how their monies are being invested, or how the investment at the time of redemption is being calculated. The only thing unsuspecting employees know is that once their redemption period accrues, they then are forced into receiving a promissory note, (or are issued a unauthorized unexecuted promissory note which was never disclosed nor agreed to?) again designed by Defendants, Wick, Tatum, Brian Moran, and John Doe(s) and must wait another period of years before they can ever recover any of their "investment".

96. From the stolen accounts, over charging IOA customers, stolen commissions, and PONZI stock scheme, IOA reaped remunerations owed to other naive unsuspecting independent representatives such as Scott Strenger, Rick A. Collins, Louis Spagnuolo, and many other agents who are now coming forward.  This results in IOA Group being able to artificially inflate its stock/member unit valuation and sell to its unsuspecting employees, in this case Plaintiff.

**A Systemic Pattern of Stolen Accounts and Insurance Commissions**

97. In October 2013, Scott Strenger (hereinafter "Strenger") began working for Defendant IOA at its New Jersey location. As Strenger's employment with IOA continued, he began to notice he was not receiving his guaranteed minimum base draw or promised commissions. In fact, Strenger was being shorted approximately half of his commissions after Defendant John stepped in to assist in the "take over" of a very large account – placing the same in the hands of a designated "co-producer" – essentially taking the account for Defendant IOA. Specifically, Defendant IOA through Defendant John and others took over Stenger's Skyline Windows account, as well as many of the Commissions and Renewals for any referrals derived from that account. Strenger sued and is currently in litigation against Defendant IOA and others in the matter styled: United States

District Court for the District of New Jersey, *Scott A. Strenger v. Insurance Office of America, Inc., et al.*, Case No: 17-cv-03332-KSH-CLW. A copy of same is appended hereto marked Exhibit "A".

98. Another example, on or about August 2013, Rick Collins (hereinafter "Collins") was offered employment with Defendant IOA at IOA Northeast Regional location in Jew Jersey as a Producer. Ultimately, Collins and IOA entered into an agreement dated August 5, 2013, which sets forth the terms and conditions of his employment with IOA. Shortly thereafter, Collins noticed he was not receiving the guaranteed commissions/agency fees and benefits he was guaranteed. Specifically, pursuant to the August 5, 2013 Contract, Collins was guaranteed 40% of the Commissions and Renewals. However, he only received half of his entitled commissions on at least one very large account. Collins, like Strenger, commenced suit in 2018 in the matter styled: *United States District Court for the District of New Jersey, Rick A. Collins v. Insurance Office of America, Inc., et al., Case No: 18-cv-08762-JMV-SCM*. A copy of same is appended hereto marked Exhibit "B".

99. A third example, in 2013, IOA agreed to pay Louis Spagnuolo (hereinafter "Spagnuolo"), another independent representative, 57% of all gross insurance commissions for both new and residual of business he procured. Spagnuolo was expected to bring high net-worth business contacts to Defendant IOA's team. And, in fact he did. In December 2013, Spagnuolo brought IOA a very large transaction, The Learning Experience, Corp. – an account that had 120 childcare centers in 2013 which has since grown to over 300 childcare and learning centers in 22 states and is valued at over $250 Million Dollars. IOA, in true form of manipulation, misrepresentation, and deceit, paid Spagnuolo only 27.5% of the account's commissions – less than half of the agreed upon 57% that was due to Spagnuolo.

100. The result was that Spagnuolo had not been paid a significant portion of remunerations for his insurance commissions on the account – which are likely in excess of Three Million Dollars ($3,000,000.00). Upon information and belief, the account today puts an estimate of over $1,200,000.00 per year, directly or indirectly, into John and Heath's pocket. Spagnuolo is now suing Defendant IOA and others in the matter styled: *In the Circuit Court in and for Broward County, Florida, Louis Spagnuolo v. Insurance Office of America, Inc., et al., Case No: CACE19-010212*. A copy of same is appended hereto marked Exhibit "C".

101. The fraudulent insurance commission scheme begins with the recruitment of new agents with the promise of "family values" and "high commission splits." Defendant IOA hires recruiters to attract the best and the brightest insurance agents with the promise of a positive working environment and the highest commission structure in the industry: 57% to 60% commission for new and residual business. The commission structure – in reality – is a farce because, in some cases, Defendants John, Valli, Heath and IOA charge the agent a "risk service" fee – an alleged proprietary fee 5% right off the top. Defendants IOA, John, and Valli apply this to agent commissions for their own financial benefit. Indeed, upon information and belief, this fee is paid in whole or in part to Defendant John when he steals an account from an IOA agent.

102. Additionally, as to some large accounts procured by a sales agent, Defendant John, Valli and/or Heath step in and "steal" the account by claiming that Defendant John, Heath or another designated IOA agent is the "producer" or "co-producer" or "lead producer" of the account without even discussing the same with the sales associate. In fact, in some instances, Defendant John is so brazen that he tells the agent that's "just how this one goes". At the end of the day, this large account may become a "status" account whereby IOA "REBATES" its insurance rates in exchange for IOA being able to use a company logo or have its name posted at a sports stadium.  By the time

Defendant John makes this declaration, the large account has been onboarded with IOA making it virtually impossible for the sales associate to have any recourse. The unwritten rule at IOA is - when the bosses, Defendants John and Heath cut you out of part of the big deal, you have to grin and bear it – or be terminated. In case of the latter, upon information and belief, Defendants John and Heath request that insurance carriers cease doing business with those IOA discards for suspicion of disloyalty.

103. In both of these schemes, Defendants John and Heath not only "steal" from the agent's initial commission, but they and IOA intentionally fail to disclose a full accounting to the sales agents as to how an account is performing over time. Additionally, the RICO Defendants fail to report when the risk associated with an account produces a "refund" by the carrier at the end of the year which would otherwise belong to the agent. Instead, this hidden profit is used to inflate the health of Defendant IOA for purposes of stock manipulation or is otherwise funneled into the RICO Defendants' pockets.

104. The common scheme also involves Defendants John, Heath and/or John Doe(s) wrongfully claiming to be either the lead producer or co-producer on the account in their sole arbitrary discretion. If Defendants John, Heath and/or John Doe(s) become the lead producer, then the sales agent is out of the picture and it appears from the books of account of IOA that it is more profitable.

105. If for example, once Defendants John or Heath "add" themselves to an account as a co-producer, the sales agent (in some circumstances) gets a hand-written reconciliation from Defendant Valli which fraudulently evidences the new "deal". Notably, this hand-written ledger is unheard of in the industry and is even more suspect considering that Defendant IOA is one of the largest independent insurance companies in the United States.

106. The net result of this fraudulent enterprise is astounding based upon the reduction in promised commissions and the amount of years this illegality continues. However, the scheme doesn't end with just reducing the actual commission split. In fact, the hand-written reconciliations are purposely riddled with deception and shortages when compared with actual printed policy premium documents. Moreover, the hand-written reconciliations do not include the entire account activity and, in fact, hide premiums otherwise attributable to the account so that the agent can never detect the extent of the fraud. The end-result is the sales agent never receives an accurate accounting as to what is actually owed and Defendants IOA (and the shareholders of IOA), Valli, and John get away with stealing and lining their own pockets by lying about the amount of premiums actually paid to IOA.

**Double-billing, a subterfuge to disguise double-billed insurance commissions as Agency Fees & Marketing Fees – and IOA's Stock rises once again**

107. IOA and management's cronies unscrupulously engage in fraudulently double-billing their unsuspecting and trusting customers.

108. For instance, in a currently active lawsuit, IOA and its "Vice-President and Co-owner", Defendant Mark Manfre allegedly devised a scheme to bill large corporations for "marketing fees" and "agency fees". *See* the matter styled: *In the United States District Court for the Northern District of Illinois, Eastern District, Executive Affiliates, Inc., et al, v. Insurance Office of America, Inc., et al., Case No: 18-cv-4343*. A copy of same is appended hereto marked Exhibit "D". In this case, defendants allegedly billed the plaintiffs additional charges over their insurance premiums disguising the charges as "marketing expenses" and "insurance marketing expenses" over and above their commercial insurance premiums, workers compensation premiums, employment practices premiums and other policies brokered by IOA. The alleged over -charged expenses amounted to the defendants pocketing over $2.8 million dollars over the insurance premiums, a

small drop in the bucket for the nearly billion-dollar IOA Enterprise. For Defendant Manfre's part in this case, Manfre at the direction of John over-billed and over charged IOA customers, all to drive IOA's stock price up, line the pockets of John and his cronies, and take the fall for the double-billing scheme that has now damaged Plaintiff Power.

109. Another example of IOA and its cronies corrupt double-billing scam takes place out of Georgia, wherein an unsuspecting customer was changed for "agency fees". The scheme works where the customer is charged for the insurance premium, and the agent should receive its commissions directly from the insurance carrier or receive the commissions out of IOA's commission split once the commission is paid by the insurance carrier to the broker, IOA. Instead, IOA and its agents contrive false invoices charging its customers "Agency Fees". A copy of once such invoice is appended hereto marked Exhibit "E". The secret behind the scheme is that the customers continuously double pay fees all while IOA splits the additional fraudulent fees with the procuring producer, driving up IOA's financial health and stock price, and never performing any additional services for their customers.

110. In the second example, the customer's independent auditor noticed the double billing scheme, yet IOA did nothing, said nothing, and brushed the matter under the proverbial rug, stealing the additional fees, and never making the customer whole.

111. Ultimately, IOA, Heath, John, and the IOA "made-men" stand to gain a windfall from employees, customers, independent sales agents, and anyone who falls victim to their cleverly disguised illegal business practices.

**Defendants' Conduct Has Injured Plaintiffs and the Class**

112. As set forth above, Plaintiff and Class members relied on Defendants' deceptions, misleading conduct, fraud, omissions and misrepresentations in purchasing insurance and IOA Group stock from IOA at substantially and artificially inflated prices. Absent Defendants'

misrepresentations, omissions, fraud, misleading conduct, and unconscionable conduct, Plaintiff and Class members would not have bought the insurance policies at issue nor would have bought the stock at a significantly inflated price.

113. As a result of Defendants' actions, Plaintiffs and Class members have suffered significant injury to their property or business including but not limited to the insurance payments and stock purchase monies Plaintiff and Class members paid for the insurance policies and stock.  Plaintiff and Class members were also injured because the stock they purchased were significantly less valuable than represented by Defendants and have become even less valuable as a result of Defendants' conduct.

114. Defendants actively concealed their conduct, their manipulation of IOA Group stock values and their concerted efforts to sell the privately held stock at issue at amounts that were far in excess of their true value. As a result, Plaintiff and Class members could not have uncovered the unlawful conduct any earlier with the exercise of reasonable diligence.

115. All conditions precedent for bringing the above captioned matter have occurred, been waived or satisfied.

116. Plaintiff has retained the services of undersigned counsel to represent his interests in this matter and is obligated to pay reasonable attorneys' fees and costs incurred herein and is therefore entitled to recover same from Defendants.

117. **JURY DEMAND**: Plaintiff demands a trial by jury on all issues so triable.

## COUNT I - CIVIL VIOLATION OF FLORIDA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("CIVIL RICO") PURSUANT TO FLA. STAT. 772.104

118. Plaintiff realleges Paragraph Numbers 1 through 117 as if fully and completely set forth herein.

119. This is an action for civil violations of Florida's Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to Florida Statute § 772.104.

120. As set forth in the general allegations above, this case involves the years-long fraudulent scheme perpetrated by Defendants Valli, John, Heath, Tatum, Harrold, Manfre, Wick, Tatum, Meyers, Masters, Brian Moran, and John Doe(s) (**"RICO Defendants"**) to (1) illegally deceive and defraud Plaintiff and Class Members into purchasing illegally inflated stocks in an effort to continue their "PONZI Scheme" (i.e., a fraudulent investment operation that pays returns to prior investors from the monies paid by subsequent investors because the scheme does not actually generate profits); (2) to take large agent accounts to manipulate IOA's stock price to the detriment of other shareholders and for their own benefit; (3) intimidation of witnesses; (4); illegally deceive and defraud IOA independent sales associates out of rightfully owed insurance commissions; and (5) illegally deceive and defraud customers into paying for "agency" and "marketing" fees for unrealized services and insurance coverage.

**Applicable Statutes**

121. This is an action for civil violations of Florida's Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to Florida Statute § 772.103(1) & (3), which provides:

It is unlawful for any person:

(1) Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(3) Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

**The Enterprise**

122. Under Florida law, an "enterprise" is defined under Fla. Stat. § **895.02(5) (2019)** -

"Enterprise" means any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities. A criminal gang, as defined in Fla. Stat. § 874.03, constitutes an enterprise.

123. The Enterprise is an ongoing organization which engages in, and whose activities affect interstate commerce.

124. Under Florida law, the federal courts provide guidance for construing Florida's RICO provisions.[2]

125. The individual RICO Defendants Valli, John, Heath, Tatum, Harrold, Manfre, Wick, Tatum, Meyers, Masters, Brian Moran, John Doe(s) and others associated in fact, constitute an "Enterprise" (hereinafter the "Enterprise" or "Association in Fact Enterprise") as described in § 895.02(5), *Fla. Stat.* (2019), which functioned for the purpose of defrauding the Plaintiff and Class Members, and enriching the Enterprise's members and associates. Each RICO Defendant conducted the affairs of the Association in Fact Enterprise or acted at the direction of John, and later Heath, in the conduct of the affairs of the Enterprise.

126. At all times relevant to this Complaint, members and associates of the Association in Fact Enterprise functioned together as a continuous unit, with a common purpose for the economic benefit and gain of the RICO Defendants who control the Enterprise, as further described below. The Association in Fact Enterprise, an association in fact of individuals, IOA Group, a legal entity controlled by John and Heath, affected interstate commerce based on Defendants' unlawfully

---

[2] *Mese v. State*, 824 So.2d 908, 912 (Fla. 3d DCA 2002).

obtaining, transmitting, billing and collecting monies through use of interstate mailings and wirings, in furtherance of the racketeering scheme as alleged in the Amended Complaint. The Enterprise had longevity sufficient to permit each of the RICO Defendants to pursue the Enterprise's purpose.

**Function Together as a Continuing Unit**

127. As described in paragraphs above, each member of the Enterprise played a role and acted in a mutual reliance on the common purpose of defrauding Plaintiff out of millions of dollars and engaging and attempting to engage in other illegal acts against Plaintiff and other victims. Each participant in the RICO Enterprise had systematic linkage to each other through corporate ties, contractual relationships, employment, financial ties and continuing coordination of activities. Defendant John, the CEO of IOA, until sometime in the year 2008, remaining the Chairman of IOA until 2018, and thereafter Heath to this day, have been the leaders of the Enterprise and controlled and directed all of the activities of the company. Defendant Valli, John's wife, worked closely with John and sent the misleading and deceptive hand-written reconciliations to Plaintiff and others similarly situated.  Defendant Heath, the son of John and Valli, was directly involved in ordering the illegal destruction of documents relevant to Defendants' illegal activities. IOA Group was used as a mechanism to offer and sell private equity stock at illegally inflated prices to Plaintiff and Class Members. Tatum was the legal counsel for IOA who under the direction of John and Heath engaged in criminal witness tampering at the direction of Defendants John and Heath, predicate activity in violation of Fla. Stat. § 918.22.  Defendant Harrold, as the regional leader of IOA's South Florida operations in Broward County, Florida, worked by using the Broward County Office to deceive customers as to insurance premiums and costs with the common goal to increase

IOA's stock price and otherwise to use IOA's platform to illegally gain through the Racketeering Enterprise.

**Common Purpose**

128. As described in the above paragraphs, the members and associates of the Association in Fact Enterprise banded together with the common purpose: to enrich themselves at the expense of Plaintiff and Class Members. The RICO Defendants share the bounty of their criminal enterprise – by sharing the financial gain from their fraudulently obtained assets and by defrauding agents and other investors. Enterprise members worked together to increase IOA's net worth for their own financial gain.

**Operation and Management/Distinctness**

129. As described herein, the RICO Defendants participated in the operation and management of the RICO Enterprise by directing its affairs as described herein.

130. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, as each individual Defendant, and IOA Group, is itself different than an association of these individuals and entity working collectively to defraud Plaintiff and Class Members.

131. The Association in Fact Enterprise has existed for more than six (6) years and continues to exist and operate.

**The Racketeering Violations**

132. From on or about February 2008, and continuing up through the date of the filing of this Complaint, the RICO Defendants Valli, John, Heath, Tatum, Harrold, Manfre, Wick, Tatum, Meyers, Masters, Brian Moran, John Doe(s), and IOA Group, each of whom are persons associated with or employed by the Association in Fact Enterprise, did knowingly and unlawfully conduct or

participate, directly or indirectly, in the Association in Fact Enterprise through a pattern of criminal activity within the meaning of Fla. Stat. § 895.02(7) (pattern) and Fla. Stat. § 895.02(8) (defining "racketeering activity,"), all in violation of Fla. Stat. § 772.103(1) & (3) (Prohibited Activities).

133. Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of the statute, and also within five (5) years after a prior incident of racketeering conduct. Defendants' actions:

(1) violated Fla. Stat. § 895.02(8)(a)(34), Chapter 817 relating to fraudulent practices, false pretenses, fraud generally, and credit card crimes;

(2) violated Fla. Stat. § 895.02(8)(a)(49) relating to tampering with or harassing a witness, victim, or informant, and retaliation against a witness, victim, or informant, all in violation of Sections 914.22 and 914.23;

(3) violated Fla. Stat. § 895.02(8)(a)(11), relating to sale of securities and investor protection;

(4) violated Fla. Stat. § 895.02(8)(a)(18), relating to transacting insurance without a certificate of authority; and

(5) violated Fla. Stat. § 895.02(8)(b) any conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1), including mail fraud and wire fraud and witness tampering statutes.

**Defendants' Commission of Specific Predicate Activity**

134. Mail and Wire Fraud Violations (Fl. Stat. § 895.02(8)(a)(34)) Chapter 817 relating to fraudulent practices, false pretenses, fraud generally, and credit card crimes; 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud):

(1) Defendants John and Heath engaged in this violative conduct in conducting the affairs of the Enterprise, *i.e.*, the Defendants together engaged in a scheme to deprive victims, of money and property by fraud, as Defendants John and Heath "steal" the accounts of sales agents (*See* Spagnuolo Complaint Exhibit "C" as incorporated herein at ¶¶ 46-51);

(2) Defendants John, Heath, and Valli intentionally failed to disclose a full accounting to the sales agent of how the account is performing and failed to report refunds which would otherwise belong to the agents (*See* Spagnuolo Complaint Exhibit "C" as incorporated herein at ¶¶ 47, 48);

(3) Defendant John wrongfully claims to be lead producer of the Spagnuolo's account to deprive the Plaintiff and others similarly situated of monies (*See* Spagnuolo Complaint Exhibit "C" as incorporated herein at ¶¶ 46-48);

(4) Fraudulent Hand-Written Reconciliations- At the direction of John, and later Heath, from at least year 2015-2018 hand-written reconciliations were prepared by Defendant Valli which falsely evidenced the circumstances in order to illegally deprive Spagnuolo of monies and assets (*See* Spagnuolo Complaint Exhibit "C" as incorporated herein at ¶¶ 47, 68-73);

(5) E-mail transmissions in (which are interstate wirings for purposes of § 1343) caused by John in furtherance of the scheme to defraud as described in Spagnuolo Complaint Exhibit "C" as incorporated herein at ¶¶ 75, 76;

**Transacting Insurance Without Certificate of Authority**

135. *See* Spagnuolo Complaint Exhibit "C" as incorporated herein, Defendant 1188 Partners – a company wholly owned and managed by Defendant John, paid the commissions. Defendant 1188 Partners is not a licensed insurance company and its payment of insurance commissions violates Florida law, and constitutes predicate activity.  Specifically, § 626.753(2) *Florida Statutes* prohibits the payment of commissions to "<u>any corporation unless such corporation is an insurance agency</u>."

136. *See* Exhibit "E", Defendants IOA, John, and Heath – Defendant IOA was not licensed to sell insurance surplus lines in New Jersey or collect payment of insurance commissions violating New Jersey law.  Specifically, from January 1, 2014 until or about August 22, 2014, [IOA] bound surplus lines policies and charged services fees to surplus lines insureds in violation to N.J.S.A. 17:22A-40a(2) and (8), 17:22A-29, 17:22-6.41(a), 17:22-6.42(c), and N.J.A.C. 11:17B-3.1(b).

**Harassing a Witness**

137. *See* Spagnuolo Complaint as incorporated herein Exhibit "C"; IOA's Corporate Counsel, defendant Tatum, on June 6, 2019, contacted Mahalic, the individual who had recruited Plaintiff to be an IOA sales agent. Mahalic testified (*See* Exhibit "F"), that Defendant Tatum contacted him for purposes of attempting to coerce him into not participating in the instant lawsuit as a witness for Plaintiff. Mahalic also testified that, based upon his knowledge of Defendants John and Tatum's relationship, Tatum's conduct and actions were directed or informed by Defendant John. Importantly, Mahalic is a fact witness as to the critical issues in the case regarding the terms of the 2013 Contract and the TLE account.  The attempted intimidation of Mahalic is in violation of Fla. Stat. § 914.22 – Tampering with or harassing a witness, victim, or informant.

**Illegal Sale of Securities**

138. As described herein John, and later Heath, and others at their direction make money by stealing the account directly and then indirectly by IOA's stock value increasing. *See* ⁋⁋ 77-81 and ⁋⁋ 97-106, Moreover, the RICO Defendants knowingly provide false information to the company valuing the company relative to its stock price.

**Pattern of Racketeering Activity**

139. A "pattern of racketeering activity" is defined as "engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct." *See* Fla. Stat. § 895.02(7).

140. Under Supreme Court law, *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) which is determinative in interpreting the Florida RICO statute, each RICO Defendant must

engage in a pattern of racketeering, as described above, which requires each Defendant meet the "continuity" plus "relationship" tests.

**Continuity Plus Relationship**

141. Plaintiff and Class Members allege that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in Fla. Stat. § 895.02(7).

142. Plaintiff and Class Members can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same purpose of defrauding Plaintiff and other investors/agents of millions of dollars, all for the personal enrichment of the Defendants and their associates.

143. Plaintiff and Class Members allege that the continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period of time, *i.e.*, from about February 2008 to the present, and involves, as described, multiple schemes and multiple victims.

144. Plaintiff and Class Members also allege that the pattern of racketeering activity is shown by the threat of continued activity as Defendant John Ritenour, and in later years, his son Heath, have directed associates throughout the years to repeatedly engage in the same illegal and illicit activities involving the operation of IOA with other agents and investors. Plaintiff has specific knowledge of other insurance agents who were similarly defrauded by the Defendants under similar circumstances and using similar means. Plaintiff has specific knowledge of other insurance agents who were similarly defrauded by the Defendants using their positions of authority to allow the stealing of a large account. Defendants John and Heath also show a threat of continued activity

as they routinely steal and/or commandeer large "status" accounts from IOA insurance agents for purposes of REBATING.

145. Thus, engaging in the pattern of racketeering as set forth herein is the regular way Defendants regularly conduct the operations of the Association in Fact Enterprise and their predicate acts threaten future criminal conduct.

146. Furthermore, the **RICO Defendants** continue to engage in these predicate acts to harm Plaintiff and other sales associates, which establishes a threat of long-term racketeering activity and evidences the continuity of Defendants' open-ended pattern of racketeering activity.

**The Injury**

147. **RICO Defendants** profited directly or indirectly, from the enterprise and Plaintiff, proximately and directly, suffered substantial damages in the form of unpaid commissions.

148. As part of the ongoing enterprise, the **RICO Defendants** conspired to deceive Plaintiff, other employees and independent sales associates for personal financial benefit. As such, the **RICO Defendants** were associated with an illegal enterprise and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of interstate mail and wire facilities to execute a scheme of criminal fraud.

149. The **RICO Defendants**, and Defendants Heath and John in particular, profited directly or indirectly, from the enterprise and Plaintiff suffered substantial damages in the form of worthless stocks paid for by unsuspecting employees and independent sales agents to inflate IOA's financial health and drive up IOA Group's stock price only to then turn around and keep the monies paid by Plaintiff, employees and independent sales agents for the worthless stock, until they solely decide to amend their devious actions and to pay the monies back.

150. As it relates to Plaintiff, the **RICO Defendants** engaged in a course of intentional conduct to prevent Plaintiff from obtaining accurate information and to fraudulently induce him and others similarly situated into purchasing worthless IOA Group stock to further their corrupt business practices.

151. The **RICO Defendants**, and Defendants Heath and John in particular, profited directly or indirectly, from the enterprise and Plaintiff suffered substantial damages in the form of worthless stocks paid for by unsuspecting employees and independent sales agents to inflate IOA's financial health and drive up IOA Group's stock price only to then turn around and keep the monies paid by Plaintiff, employees and independent sales agents for the worthless stock, until they solely decide to amend their devious actions and to pay the monies back.

152. At all times material hereto, the **RICO Defendants** were associated-in-fact for the common purpose of engaging in their fraudulent scheme to appropriate Plaintiff's hard-earned monies to worthless stock for their pecuniary personal benefit. These members of the RICO enterprise all share a common purpose: to enrich themselves and, in the case of Defendants Heath and John – to fund other business projects such as their interests in real estate ventures– all at the expense of Plaintiff and other employees and sales agents.  The **RICO Defendants** all shared in the bounty of their criminal enterprise – by sharing (in one form or another) the financial gain from illegally defrauding Plaintiff (and other employees and sales agents) and fraudulently deceiving him with respect to laundering Plaintiff's stock monies, fraudulently selling worthless stock to Plaintiff, and deceiving Plaintiff into thinking IOA and IOA Group's financial health was stable all in the grand scheme to cash Defendant John out of his interest in IOA so he could retire and benefit the **RICO Defendants** in their personal and other business ventures.

153. The **RICO Defendants** participated in the operation and management of the RICO enterprise by directing its affairs as described herein.

154. In order to successfully and convincingly market insurance policies at artificially inflated prices and get purchasers to pay at inflated prices, Defendants needed an organization and system that enabled them to effectively establish an aura of bona fide values and demand. The Enterprise provides that organization and system. While each of the Defendants would typically act independently, the participation of insurance agents, IOA directors, employees, attorneys, and officers allows the Enterprise to function effectively and eliminates the checks and balances that would normally protect purchasers and conceals the true and common objective of the Defendants.

155. In order to successfully and convincingly market IOA Group privately-held stock at artificially inflated prices and get independent agents and employees to pay at inflated prices, Defendants needed an organization and system that enabled them to effectively establish an aura of bona fide values and demand. The Enterprise provides that organization and system.  While each of the Defendants would typically act independently, the participation of IOA directors, employees, attorneys, and officers allows the Enterprise to function effectively and eliminates the checks and balances that would normally protect purchasers and conceals the true and common objective of the Defendants.

156. The Defendants control and operate the Enterprise through a variety of means, including, but not limited to, the following:

   a.  investing funds to secure and preliminarily develop the privately- held stock for sale in member unit offerings to individual purchasers such as Plaintiff and the Class;

   b.  developing and utilizing a common marketing plan designed to mislead prospective buyers regarding the high value and high demand for the privately held stock within the IOA "family";

c. agreeing to orchestrate, finance and/or participate in straw purchases, filing inaccurate and false valuations and records, using inappropriate valuations, stolen accounts and other tactics to create sales data that appears to support the representations of high value and high demand;

d. agreeing to facilitate the approval and funding of the privately held stock at amounts that do not correspond to the true value of the privately-held stocks, but rather which are based upon inflated/manipulated values;

e. agreeing to manipulate the values of the stock;

f. retaining inflated profits from the sale of the inflated stock resulting from the conduct of the Enterprise.

157. The Defendants control and operate the Enterprise through a variety of means, including, but not limited to, the following:

a. developing and utilizing a common marketing plan designed to mislead prospective insurance policy buyers regarding the value and need for additional insurance fees such as the agency fees and marketing fees to IOA customers and prospective customers;

b. agreeing to orchestrate and/or participate in tactics to create sales data that appears to support the representations of value and need for additional coverage;

c. agreeing to facilitate the purchase of additional/supplemental coverage that do not correspond with true or accurate coverage or services of the additional agency fees and marketing fees;

d. retaining inflated profits from the sale of the agency and marketing fees resulting from the conduct of the Enterprise.

158. While the **RICO Defendants** participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different roles, bank accounts and financials.

159. These Defendants conducted and participated in the affairs of the **RICO** enterprise through a pattern of racketeering activity that consisted of repeated violations of the federal mail and wire fraud statutes and violations of Florida law relative to the PONZI stock scheme,

intentional misrepresentation of corporate accounts, money laundering, illegally splitting insurance commissions and tax evasion - all with the intent to defraud.

**Predicate Acts - Mail and Wire Fraud**

160. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

**Violations of 18 U.S.C. § 1341 AND 8 U.S.C. § 1343**

161. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises Defendants in violation of 18 U.S.C. § 1341 caused matter and things to be delivered by the Postal Service or by private or commercial interstate carriers. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

162. Defendants carried out their scheme in different states and internationally and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

163. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

164. The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate media include, inter alia:

    a.   Correspondence and marketing materials that intentionally misled Plaintiff and Class Members regarding the interest and availability of privately held stock as held by IOA Group;

    b.   Correspondence and marketing materials that intentionally misrepresented the value of the stock as held by IOA Group that were the subject of the scheme;

    c.   Correspondence, contracts, agreements, valuation reports, financing documents, powers of attorney and other materials used to further Defendants' fraudulent scheme and buttress misrepresentations regarding the amount of interest in and value of IOA Group stock;

    d.   Correspondence and e-mails between Defendants regarding the scheme and conduct to be undertaken in furtherance of the scheme; and

    e.   Other matters and things sent through or received from the Postal Service, private or commercial carrier or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

165. Defendants' misrepresentations, omissions, deceptions and acts of concealment were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class and obtaining their property for Defendants' gain.

166. Defendants either knew or recklessly disregarded the fact that the misrepresentations and deceptions described above were material, and Plaintiff and the Class Members relied on the misrepresentations and omissions set forth above.

167. These Defendants conducted and participated in the affairs of the **RICO** enterprise through a pattern of racketeering activity that consisted of repeated violations of the federal mail and wire fraud statutes and violations of Florida law relative to the PONZI stock scheme, intentional misrepresentation of corporate accounts, money laundering, illegally splitting insurance commissions and tax evasion - all with the intent to defraud.

168. As a result of Defendants' fraudulent scheme, Defendants have obtained money and property belonging to Plaintiff and Class Members, and the Plaintiffs and the Class have been injured in their business or property by the Defendants' overt acts of mail and wire fraud.

169. Furthermore, the **RICO Defendants** continue to engage in these predicate acts to harm Plaintiff and Class Members, which establish a threat of long-term racketeering activity and evidence the continuity of Defendants' open-ended pattern of racketeering activity.

170. The **RICO Defendants** had the specific intent to participate in the overall RICO enterprise, which is evidenced by the scheme to defraud Plaintiff and Class Members.

171. Pursuant to the **RICO Defendants'** conduct, Plaintiff and Class Members have suffered damages.

**WHEREFORE**, Plaintiff and Class Members demand judgment as to Count I against the **RICO Defendants** for compensatory and treble damages, pre and post-judgment interest, attorneys' fees and costs incurred in bringing this action and for such other relief as this Court deems just and proper.

## COUNT II- VIOLATION OF FLORIDA'S SECURITIES AND INVESTOR PROTECTION ACT PURSUANT TO FLA. STAT. §§ 517.01

172. Plaintiff and Class Members incorporate and reallege Paragraph Numbers 1 through 117 above as if fully set forth herein.

173. Fla. Stat. § 517.301 makes it unlawful for anyone, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not

misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

174. Defendants generally solicited customers to invest in insurance policies and employees and independent sales representatives to invest in private equity stocks, for which it received commissions; but Defendants failed to inform the employees/public, including Plaintiff and Class Members, of, *inter alia*, the risks of Defendants' monies to protect investor assets, which is a fraudulent activity as defined in Fla. Stat. §§ 517.011, *et seq.*

175. More specifically, Defendants:

    a. Employed a scheme to defraud Plaintiff and Class Members and other investors;

    b. Obtained Plaintiff and Class Members' stock purchase monies by means of untrue statements of material fact; and

    c. Engaged in transactions and a course of business which operated as a fraud or deceit upon Plaintiff and Class Members.

176. As Defendants intended, Plaintiff and Class Members justifiably relied on the material misrepresentations Defendants made to Plaintiff and Class Members in connection with Plaintiff and Class Members' stock purchase from IOA Group to Defendants.

177. As a direct and proximate result of Defendants' violation of Fla. Stat. §§ 517.011, *et seq.*, Plaintiff and Class Members have suffered damages.

178. Defendants participated in, or aided in, the unlawful procurement of Plaintiff and Class Members' monies in furtherance of Defendants' fraudulent scheme.

179. Plaintiff and Class Members is entitled to an award of attorneys' fees pursuant to Fla. Stat. §§ 517.211.

**WHEREFORE,** Plaintiff and Class Members demand judgment against Defendants for their violations of Florida's Securities and Investor Protection Act and seeks an amount within the

jurisdictional limits of this Court, together with interest and attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

### COUNT III- CIVIL VIOLATION OF FLORIDA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("CIVIL RICO") PURSUANT TO FLA. STAT. 772.103(4) -CONSPIRACY TO COMMIT PROHIBITED ACTIVITIES

180. Plaintiff and Class Members repeat each of the allegations contained in Paragraphs 1 through 171 as if set forth herein at length.

**The Conspiracy**

181. Plaintiff and Class Members allege that commencing in February 2008, and continuing until the present time, the RICO Defendants described above, conspired to violate Fla. Stat. § 772.103(1) & (3), all in violation of Fla. Stat. § 772.103(4). Each Defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of the predicate activity as more fully described in Count I. Plaintiff alleges that the conspiratorial objective of that mutual agreement was intended to obtain Plaintiff's interests in business and/or property, and that such conspiratorial conduct violates Florida Statute § 772.103(4), *i.e.,* to conspire or endeavor to violate any of the provisions of subsection (3).

182. Each RICO Conspiracy defendant intended to further the schemes to defraud, which as described in Count I were completed and satisfied by at least one substantive individual Defendant. As demonstrated in detail above, the Defendants have engaged in numerous predicate racketeering acts in furtherance of the conspiracy including predicate acts consisting of mail fraud; wire fraud (which is conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1) as prohibited in Fla. Stat. § 895.02(8)(b); and violations of Fla. Stat. § 895.02(8)(a)(11) (relating to sale of securities); Fla. Stat. § 895.02(8)(a)(18) (relating to transacting insurance without a certificate of authority); Fla. Stat. § 895.02(8)(a)(34) (relating to fraudulent practices, false pretenses, fraud

generally); and Fla. Stat. § 895.02(8)(a)(49) (relating to tampering, harassing and retaliation against a witness or victim).

183. The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each Defendant not only agreed to the objective of conspiring to violate Fla. Stat. § 772.103(1) & (3), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

184. The agreement to violate RICO with regard to each conspiracy defendant is as follows:

(1) Defendant John, until sometime in year 2008, was the CEO of IOA, and the leader of the association in fact enterprise. John himself caused and directed other conspirators to engage in multiple acts of mail fraud, wire fraud, securities violations, and witness tampering, all predicate activity, to further effectuate the defrauding of Plaintiff and other similarly situated agents and investors. Through the causing of multiple racketeering acts and his leadership of the enterprise, Defendant John has conspired to violate Fla. Stat. § 772.103(1) & (3), all in violation of Fla. Stat. § 772.103(4).

(2) Defendant Heath became the CEO of IOA sometime in year 2008 and later Chairman and CEO of IOA in 2018 and since that time has been the leader of the Enterprise. Heath himself caused and directed other conspirators to engage in multiple acts of mail fraud, wire fraud, illegal distribution of insurance commissions and securities violations all predicate activity, to further effectuate the defrauding of Plaintiff and other similarly situated agents and investors. Through the causing of multiple racketeering acts and his leadership of the enterprise, Defendant Heath has conspired to violate Fla. Stat. § 772.103(1) & (3) all in violation of Fla. Stat. § 772.103(4).

(3) Defendant Valli is the wife of John and mother of Heath. Valli has followed directions from these aforementioned leaders in furthering the fraudulent schemes by preparation and distribution of the misleading and thereby fraudulent hand-written reconciliations which unlawfully deprived the Plaintiff, and others, of commissions due them, and furthered the part of the scheme

48

involving the manipulation of Defendant IOA's stock price. Through the causing of multiple racketeering acts, at the direction of the Enterprise leaders, Defendant Valli has conspired to violate Fla. Stat. § 772.103(1) & (3), all in violation of Fla. Stat. § 772.103(4).

(4) Defendant Tatum is corporate counsel for Defendant IOA and has followed directions from these aforementioned leaders John, Heath, and Valli, to seek to coerce a witness (Mahalic) not to testify as a witness in this instant proceeding. *See* ¶¶ 55-57. Tatum is a proper RICO conspiracy defendant because by seeking to tamper with a witness, predicate activity, Defendant Tatum agreed to further the fraudulent schemes described herein and agreed that a substantive Defendant would engage in multiple acts of racketeering, all in violation of Fla. Stat. § 772.103(1) & (3), all in violation of Fla. Stat. § 772.103(4).

(5) Defendant Harrold is one of the leaders of IOA's South Florida operations and IOA's Broward County Office.  Defendant Harrold participated in the RICO conspiracy by purposefully defrauding IOA customers with misleading and false information related to insurance premium pricing and costs.  Through the causing of multiple racketeering acts and his leadership of the enterprise, Defendant Harrold has conspired to violate Fla. Stat. § 772.103(1) & (3), all in violation of Fla. Stat. § 772.103(4).

**The Injury**

185.  As a direct and proximate result of the Defendants' agreement that conspirators would violate Fla. Stat. § 772.103(1) & (3) Plaintiff and Class Members have been and is continuing, directly and proximately, to be injured in their business or property as set forth more fully above.

**WHEREFORE,** Plaintiff and Class Members demand entry of judgment against Defendants John, Valli, Heath, Harrold and Tatum as to Count III and seeks an award of compensatory and treble damages, for attorneys' fees costs, and for such other further relief this Court deems just and proper.

## COUNT IV - CONVERSION

186. Plaintiff and Class Members incorporate and reallege Paragraph Numbers 1 through 117 above as if fully set forth herein.

187. At all times material hereto, Plaintiff and Class Members' stock purchase monies were and are solely owned by Plaintiff and Class Members.

188. At all times material hereto, Defendant IOA Group intentionally and substantially interfered with Plaintiff and Class Members' use of their stock purchase monies by taking the funds and misappropriating the funds for their own personal use and enjoyment.

189. Plaintiff and Class Members did not consent in any manner to Defendants taking the funds at issue for their own personal use.

190. Plaintiff and Class Members have been damaged in an amount to be proven at trial as a result of Defendant IOA Group's actions in converting and misappropriating Plaintiff and Class Members' stock purchase monies.

191. In addition, Plaintiff and Class Members' damages are ongoing and increasing.

**WHEREFORE**, Plaintiff and Class Members demand judgment against Defendant IOA Group for compensatory damages, together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Honorable Court deems just and proper.

## COUNT V - FRAUDULENT MISREPRESENTATION

192. Plaintiff incorporates and realleges Paragraph Numbers 1 through 117 above as if fully set forth herein.

193. Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView ("Fraudulent Misrepresentation Defendants") willfully and intentionally made material

misrepresentations to Plaintiff before, during and after Plaintiff's purchases of IOA Group stocks regarding the terms of the stock purchase and value therein, the financial health of IOA and IOA Group, and the false representations of Plaintiff's stock purchase monies relative to how it was being used and disbursed.

194. More specifically, Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView willfully and intentionally misrepresented to Plaintiff that he would be purchasing IOA Group stock and that IOA and IOA Group's financial health was stable and prosperous when in fact IOA was stealing independent sales agent insurance commissions to inflate the value of IOA, IOA Group was laundering Plaintiff and other employees and sales agents stock purchase monies to personal and other business ventures of Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView, and IOA and IOA Group never had the financial stability to pay back any stock dividends, profits, or stock redemption value when Plaintiff, other employees and sales associates were later required to redeem his stock. Instead, Plaintiff other employees and sales associates would then be forced into receiving a promissory note for payment over a period of time in order to ever recover their stock "investment" into IOA and IOA Group.

195. Defendants knew that their misrepresentations, inducements, concealments, and manipulations of IOA and IOA Group's financial health, were made with the intent to defraud Plaintiff out of investment monies into a worthless IOA Group stock pool.

196. Defendants' statements were made intending solely to defraud Plaintiff and steal Plaintiff's investment monies to pay off different other employees and sales agents when their stocks came due for redemption.

197. Defendants made fraudulent misrepresentations and Plaintiff reasonably and justifiably relied on those fraudulent misrepresentations in good faith to his detriment.

198. The Defendants' unconscionable acts are fraudulent, deceitful and were committed intentionally to significantly and irreparably harm Plaintiff. Such conduct supports and justifies Plaintiff's prayer for punitive damages along with the factual allegations incorporated herein.

199. As a direct and proximate result of the Defendants' conduct, Plaintiff has been damaged.

200. Plaintiff reserves the right to amend its pleadings to assert a claim for punitive damages due to the Defendants intentional and malicious and deceitful conduct alleged herein.

**WHEREFORE,** Plaintiff demands Judgment against Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView and seeks an award of compensatory damages and costs and for such other further relief this Court deems just and proper.

## COUNT VI - FRAUDULENT TRANSFERS

201. Plaintiff realleges Paragraph Numbers 1 through 117 as if fully set forth herein.

202. This is an action for equitable and other relief pursuant to the Uniform Fraudulent Transfer Act, Florida Statute §726.101 et. seq. and Florida Statute §56.29.

203. Upon information and belief, Defendants IOA, IOA Group, Heath, John, Harrold and John Doe(s) (collectively "Transferor Defendants") have engaged in fraudulent acts in furtherance of a fraudulent scheme to transfer Plaintiff's unpaid remunerations out of the reach of Plaintiff.

204. Upon information and belief, the Transferor Defendants, transferred Plaintiff's stock purchase monies and capital investments from other unsuspecting investors to the Defendants, NuView, Grace Church, IOA Properties LLC, Whitten, Wanda, and John Doe(s) (collectively "Transferee Defendants") personally and to Transferor Defendants' owned and operated entities.

205. All of these transfers were made by the Transferor Defendants, while each entity or individual was either failing, insolvent or otherwise upside down because the liabilities incurred by those ventures and/or individuals far exceeded their assets and/or abilities to pay.

206. These illicit and fraudulent transfers made by the Transferor Defendants to the Transferee Defendants and their other entities and/or directors were made without adequate compensation or justification.

207. The transfers were made by systematic and continuous revenue sharing or fraudulent transfer between individual Transferor Defendants and their owned and operated business endeavors with the actual intent to hinder, delay or defraud creditors such as Plaintiff and/or to evade tax consequences. The same constitutes a fraudulent transfer in violation of Florida Statue §726.105(1)(a).

208. Further, the Transferor Defendants did not receive reasonably equivalent value for the transfers and intended to incur – or believed or reasonably should have believed that they would incur – debts beyond their ability to pay as they become due, and thus the transfer at issue is in violation of §726.105(1)(b). Plaintiff is thus, entitled to relief under §726.108.

209. Plaintiff lacks an adequate remedy at law because, unless the relief sought in this count is granted, the Transferor Defendants will have succeeded in fraudulently transferring assets beyond the reach of Plaintiff.

**WHEREFORE,** Plaintiff demands judgment for fraudulent transfers and requests that this Court grant the following relief: (1) an appointment of a receiver to take charge of Transferee Defendants' assets; (2) an injunction against further disposition or assignment of remunerations; (3) a Judgment decreeing that the fraudulent transfers are void and directing the appropriate authority to take the transferred remunerations to satisfy execution; (4) an award of Plaintiff's attorneys' fees and costs for having to file and prosecute this action and; (5) for such further relief as this Court deems just and proper.

## COUNT VII – FRAUDULENT INDUCEMENT

210. Plaintiff incorporates and realleges Paragraphs 1 through 117 above as if fully set forth herein.

211. Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView, and their representatives intentionally concealed or failed to disclose material facts to Plaintiff.

212. Specifically, Defendants failed to disclose that IOA and IOA Group's financial health were artificially inflated for the purpose to lure Plaintiff, and other employees and sales associates to purchase worthless IOA Group stocks.

213. Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView, and their representatives knew that IOA and IOA Group's financial wealth was artificially inflated through stealing independent sales agent accounts, manipulation of commission reports, insurance policy premium documentation and stealing large insurance accounts from unsuspecting independent sales agents in totality were material facts that should have been disclosed to Plaintiff.

214. Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView knew or should have known that their concealment of the above referenced material facts would prevent Plaintiff from discovering the truth of the PONZI stock scheme that Plaintiff had invested his hard-earned stock purchase monies in.

215. Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView had a duty to disclose these material facts.

216. Plaintiff relied on Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView's misinformation and misrepresentations to his detriment and, pursuant to Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView's conduct, was unable to discover Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView's fraudulent concealment at the time it occurred.

217. Plaintiff reserves the right to amend its pleadings to assert a claim for punitive damages due to the Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView's intentional, malicious and deceitful conduct alleged herein.

**WHEREFORE**, Plaintiff demands judgment against Defendants Heath, John, Wick, Masters, Meyers, IOA, IOA Group and NuView, compensatory damages together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

<u>**COUNT VIII – AIDING & ABETTING**</u>

218. Plaintiff incorporates and realleges Paragraphs 1 through 117 above as if fully set forth herein.

219. Defendant Motley is Defendant IOA's present South Carolina Regional President and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise

220. Defendant Eades is Defendant IOA's present Georgia Regional President and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

221. Defendant Harrold is Defendant IOA's Fort Lauderdale, Broward County office's present Vice President and top producer and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

222. Defendant Grieco is Defendant IOA's present Senior Vice President and Insurance Broker and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

223. Defendant Masters is Defendant IOA's present chief financial officer and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

224. Defendant Meyers is Defendant IOA's present chief financial officer and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

225. Defendant Wick is Defendant IOA's present general in-house counsel and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

226. Defendant Tatum is Defendant IOA's present general in-house counsel and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

227. Defendant Choiniere is Defendant IOA's present general in-house counsels' legal assistant and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

228. Defendant Brian Moran is Defendant IOA's present outside litigation counsel.

229. Defendant Whitten is Defendant Grace Church's present pastor and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant Grace Church's business and financial enterprise.

230. Defendant Lagos is Defendant IOA's present President and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

231. Defendant Schick is Defendant IOA's present Human Resources Director and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

232. Defendant Quintero is Defendant IOA's present National Director of Operations and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant IOA's business and financial enterprise.

233. Defendant Wright is Defendant Sheldrick's present Senior Vice President and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant Sheldrick's business and financial enterprise.

234. Defendant Rosenbloom is Defendant Sheldrick's present President and equity shareholder and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant Sheldrick's business and financial enterprise.

235. Defendant Smith is Defendant Sheldrick's present Senior Vice President and/or director, shareholder, and employee who manages and develops the inner-workings of Defendant Sheldrick's business and financial enterprise.

236. Defendants John Doe(s) is/are past/present officers, directors, shareholders, employees of Defendant IOA who managed and developed the inner-workings of Defendant IOA's business and financial enterprise.

237. Defendants Motley, Eades, Harrold, Grieco, Masters, Meyers, Wick, Tatum, Choiniere, Brian Moran, Whitten, Lagos, Schick, Quintero, Wright, Rosenbloom, Smith, and John Doe(s), through their positions as acting officers, shareholders, and/or board members of Defendants IOA, IOA Group, Grace Church and Sheldrick, rendered substantial assistance to the RICO Defendants

in their perpetration of the fraudulent misrepresentation, fraudulent concealment, and fraudulent transfers alleged herein.

238. But for Defendants Motley, Eades, Harrold, Grieco, Masters, Meyers, Wick, Tatum, Choiniere, Brian Moran, Whitten, Lagos, Schick, Quintero, Wright, Rosenbloom, Smith, and John Doe(s)' active or passive participation in the fraudulent misrepresentation, fraudulent inducement, and fraudulent transfers, same would not have succeeded, and Plaintiff would not have been victimized by the RICO Defendants.

239. In their respective positions, Defendants Motley, Eades, Harrold, Grieco, Masters, Meyers, Wick, Tatum, Choiniere, Brian Moran, Whitten, Lagos, Schick, Quintero, Wright, Rosenbloom, Smith, and John Doe(s) failed to institute adequate policies and procedures to monitor and prevent the very type of fraud and scheme that occurred as alleged hereinabove.

240. Upon information and belief, Defendants Motley, Eades, Harrold, Grieco, Masters, Meyers, Wick, Tatum, Choiniere, Brian Moran, Whitten, Lagos, Schick, Quintero, Wright, Rosenbloom, Smith, and John Doe(s) had actual or constructive knowledge of the fraudulent misrepresentations against Plaintiff as alleged herein and they played vital roles in the success and maintenance/expansion of the fraudulent malfeasance.

241. As a direct and proximate result of the foregoing, Defendants Motley, Eades, Harrold, Grieco, Masters, Meyers, Wick, Tatum, Choiniere, Brian Moran, Whitten, Lagos, Schick, Quintero, Wright, Rosenbloom, Smith, and John Doe(s)are liable for damages caused to Plaintiff through Defendants Heath, John, IOA, IOA Group, Grace Church and Sheldrick's fraudulent actions and omissions.

**WHEREFORE,** Plaintiff demands entry of a judgment against Defendants Motley, Eades, Harrold, Grieco, Masters, Meyers, Wick, Tatum, Choiniere, Brian Moran, Whitten, Lagos, Schick,

Quintero, Wright, Rosenbloom, Smith, and John Doe(s) for compensatory damages and costs and for such further relief as this Court deems just and proper.

## COUNT IX – CIVIL CONSPIRACY

242. Plaintiff realleges Paragraph Numbers 1 through 117 as if fully and completely set forth herein.

243. Defendants John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s) conspired with one another, as well as other individuals and entities ("John Does"), to perpetrate unlawful acts upon Plaintiff or to perpetrate a lawful act by unlawful means, *to wit*: Defendants Heath, John, and IOA engaged in a pattern and practice of luring unsuspecting employees and insurance agents to purchase worthless and artificially inflated IOA Group stock by promising certain investment returns.

244. Defendants John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick and John Doe(s) routinely stole insurance agent accounts, doctored financial reports, permitted the overcharging of IOA customers and/or falsified IOA and IOA Group's financial health which allowed them to steal stock purchase monies owed to employees and sales agents such as Plaintiff in a wide-spread PONZI Stock scheme against IOA's own employees and independent sales agents. Defendants John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s) intentionally steal accounts from unsuspecting independent sales agents to artificially inflate Defendant IOA Group's stock and Defendant IOA's financial health and then steal the stock purchase monies to repay other employees and independent sales agents when their stocks are ready to be redeemed.

245. The participants in the conspiracy, including John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s), put their own pecuniary interests ahead of the welfare and economic safety of victims of the conspiracy, including Plaintiff.

246. Upon information and belief, John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s), had actual or constructive knowledge of the insurance commissions scam and Defendants were aware that they were playing a vital role in the success and maintenance/expansion of the PONZI STOCK SCHEME.

247. As a direct and proximate result of John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s)' participation in, and furtherance of, the conspiracy, Plaintiff has suffered damages.

248. Plaintiff reserves the right to amend its pleadings to assert a claim for punitive damages due to the John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s)' intentional and malicious and deceitful conduct alleged herein.

**WHEREFORE,** Plaintiff demands entry of judgment against John, Heath, Harrold, Motley, Eades, Grieco, Manfre, Wick, Tatum, Brian Moran, Schick, Quintero, IOA, IOA Group, Sheldrick, and John Doe(s) and seeks an award of compensatory damages and costs and for such other further relief this Court deems just and proper.

## COUNT X – SPOLIATION OF EVIDENCE BY DEFENDANTS IOA, JOHN, HEATH, MOTLEY & JOHN DOE(S)

249. Plaintiff realleges Paragraph Numbers 1 through 117 as if fully and completely set forth herein.

250. On or about November 1, 2018, after Plaintiff had been released from his employment with IOA, Defendants John, Heath, and upon information and belief, Defendant Motley directed the destruction of text messages, emails and evidence of electronic communications through, *inter alia*, the resetting or reformatting of at least one electronic device without prior notification to Plaintiff.

251. Upon information and belief, Defendants John and Heath also directed the harvesting of emails and electronic communications otherwise subject to discovery in this case and have filtered the same with an intention to withhold discoverable information from Plaintiff.

252. Plaintiff relied upon Defendants IOA, John, Heath, Motley, and John Doe(s) to preserve this crucial evidence in this civil action.

253. When Defendants IOA, John, Heath, Motley and John Doe(s) directed and destroyed, eliminated, erased, deleted, white washed and scrubbed emails, text messages, and other communications, while these Defendants were aware of the existence of litigation requiring preservation of the evidence that was the and destroyed, eliminated, erased, deleted, white washed and scrubbed. The destroyed, eliminated, erased, deleted, scrubbed evidence, inclusive of the aforementioned emails, text messages, and other communications, are highly relevant, material and crucial evidence in the proving of Plaintiff's claims against RICO Defendants.

254. Subsequent to the commencement of this action, Defendants IOA, John, Heath, Motley and John Doe(s) knew or should have known that the evidence, inclusive of the aforementioned emails, text messages, and other communications would be material evidence in any potential civil action arising out of the dispute herein.

255. Because of the actual existence of pending litigation, and the importance of the preservation of evidence, inclusive of the aforementioned emails, text messages, and other communications, in any such action was reasonably foreseeable by Defendants IOA, John, Heath, Motley and John Doe(s), Defendants IOA, John, Heath, Motley and John Doe(s) had a duty to preserve the subject evidence.

256. Defendants IOA, John, Heath, Motley and John Doe(s)' actions in causing the destruction, elimination, erasing of, deletion and scrubbing of evidence, Plaintiff and his experts are unable to inspect, examine or test the evidence without highly sophisticated and intrusive means of forensic analysis.

257. By causing the destruction, elimination, erasing of, deletion and scrubbing of evidence, Defendants IOA, John, Heath, Motley and John Doe(s) have significantly impaired Plaintiff from proving his claims and/or has outright prevented Plaintiff from proving his claims through the destruction of this crucial evidence.

258. As a direct and proximate result of Defendants IOA, John, Heath, Motley and John Doe(s)' actions causing the destruction, elimination, erasing of, deletion and scrubbing of evidence, inclusive of emails, text messages, and other communications, Plaintiff will suffer damages because he will be significantly impaired or prevented from proving his claims against Defendants IOA, John, Heath, Motley and John Doe(s).

**WHEREFORE,** Plaintiff Woodrow Power demands judgment against Defendants IOA, John, Heath, Motley and John Doe(s) and seeks an award of compensatory damages, punitive damages, equitable relief, attorneys' fees and costs, and for such other further relief this Court deems just and proper.

## COUNT X - MOTION FOR APPOINTMENT OF RECEIVER PURSUANT TO
## FLA. STAT. §726.108(c)(2)

259. Plaintiff realleges Paragraph Numbers 1 through 117 as if fully and completely set forth herein.

260. This is an action and motion for appointment of receiver over the assets of Defendants IOA Group and IOA.

261. As defined by Florida Statute §726.102(4), Plaintiff has claims against Defendants IOA Group and IOA and which include his right to payment.

262. Plaintiff is a creditor as defined by Florida Statute §726.102(5) because he has claims against Defendants IOA Group and IOA as referenced hereinabove.

263. Pursuant to Florida Statute §726.108(c)(2), this Court has the authority to appoint a receiver to take charge of the assets of Defendants IOA Group and IOA to prevent any further fraudulent transfers of their assets.

264. As detailed in Count II, RICO Defendants engage in a pattern of practice which included illegal transfers of assets, manipulating information about non-publicly traded companies, theft, money laundering, tax evasion and mail and wire fraud for purposes of personal financial gain.

265. To continue to allow RICO Defendants to operate IOA Group and IOA in such a manner will continue to damage Plaintiff as a creditor of Defendants IOA Group and IOA.

266. The appointment of a Receiver is necessary to preserve these corporations and assets from continued waste and misuse.

267. Soneet Kapila is a duly qualified and bonded receiver and has heretofore been found qualified and appointed as receiver by Florida State Courts and Federal Courts. Additionally, Mr. Kapila serves as both a Chapter 7 and Chapter 11 United States Bankruptcy Trustee.

268. If appointed, the Receiver should be required to perform an immediate audit of Defendants IOA Group and IOA's assets and issue a report as to the status of Plaintiff's Assets.

269. Plaintiff has no adequate remedy at law but to request a Court-Appointed Receiver to take over control of the assets of Defendants IOA Group and IOA. If a Receiver is not appointed, RICO Defendants would waste or otherwise dispose of Plaintiff's assets and funds necessary to pay Plaintiff's claims.

**WHEREFORE,** pursuant to Florida Statute §726.108(c)(2), Plaintiff requests this Honorable Court appoint Soneet Kapila as the Receiver over the assets of Defendants IOA Group and IOA and further relief as this Court deems just and proper.

## COUNT XI - EQUITABLE ACCOUNTING AGAINST SHELDRICK & IOA GROUP

270. Plaintiff realleges Paragraph Numbers 1 through 117 as if fully and completely set forth herein.

271. From at least 2008, Defendant IOA and IOA Group utilized the valuation services and provided Defendant Sheldrick with financial documentation to perform IOA and IOA Group valuations of their stock price.

272. Since Defendants IOA Group, Sheldrick and John Doe(s) are in possession of the data and information that accurately reflects the means for computing IOA Group's stock price and value, Plaintiff is unable to calculate the monies owed without an accounting by Defendants IOA, IOA Group, Sheldrick and John Doe(s) of Plaintiff's stock purchases from IOA Group.

273. Plaintiff is without an adequate remedy at law unless Defendants IOA Group, Sheldrick, and John Doe(s) are ordered to provide the accounting.

274. Plaintiff is dependent on Defendants IOA Group, Sheldrick, and John Doe(s) to provide it with a calculation of the actual valuation of IOA Group stock.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter an order requiring Defendants IOA Group, Sheldrick, and John Doe(s) to provide an accounting of all financial documentation to perform IOA and IOA Group valuations of their stock price to accurately calculate Plaintiff's investment into IOA Group's stock and for such other further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by Jury on all issues so triable.

DATE: February 26, 2020.

> **FARROW LAW, P.A.**
> ***A Litigation Law Firm***
>
> Attorneys for Plaintiffs
> 4801 S. University Drive, Suite 132
> Davie, Florida 33328
> Telephone: (954) 252-9818
> Facsimile: (954) 252-9821
> jay@farrowlawfirm.com
> meera@farrowlawfirm.com
>
> BY: _/s/**JAY L. FARROW, ESQ.**,_____
>      JAY LEWIS FARROW, ESQUIRE
>      Florida Bar Number: 625213
>      MEERA K. KOODIE, ESQUIRE
>      Florida Bar Number: 1020242